IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RAYMOND A. WATTERSON,                    )    Civil No. 10-060-JE
                                         )
            Plaintiff,                   )
                                         )
                                         )    FINDINGS AND
                                         )    RECOMMENDATION
            v.                           )
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
            Defendant.                   )
_____  )

Richard Sly
1001 SW 5th Avenue, Suite 310
Portland, OR 97204

Linda Ziskin
PO Box 2237
Lake Oswego, OR 97035

            Attorneys for Plaintiff

FINDINGS AND RECOMMENDATION – 1

Dwight C. Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204

Lisa Goldoftas
Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221 A
Seattle, WA 98104-7075

       Attorneys for Defendants


JELDERKS, Magistrate Judge:

       Plaintiff Raymond Watterson brings this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner of Social Security (the

Commissioner) denying his application for Supplemental Security Income (SSI) benefits and

disability insurance benefits (DIB) under the Social Security Act (the Act). Plaintiff seeks an

Order reversing the decision of the Commissioner and remanding the action to the Social

Security Administration (the Agency) for an award of benefits.

       For the reasons set out below, the Commissioner's decision should be affirmed.

### **Procedural Background**

       Plaintiff filed his application for SSI and DIB benefits on December 1, 2004, alleging that

he had been disabled since December 1, 2002. After his application was denied initially and

upon reconsideration, Plaintiff timely requested a hearing before an Administrative Law Judge

(ALJ).

       A hearing was held before ALJ Catherine Lazuran on September 20, 2007. In a decision

dated March 24, 2008, ALJ Lazuran found that Plaintiff was not disabled within the meaning of

the Act. That decision became the final decision of the Commissioner on November 19, 2009,

FINDINGS AND RECOMMENDATION – 2

when the Appeals Council denied Plaintiff's request for review.  In the present action, Plaintiff

seeks review of that decision.

## Factual Background

Plaintiff was born on March 7, 1972 and was 36 years old when the ALJ issued her

decision.  Plaintiff has past relevant work experience as a car lot attendant, shipping and

receiving clerk and supervisor, child care worker, market researcher, auto repossession worker,

roofer, restaurant worker, and pallet builder.  He alleged that he was disabled by a combination

of impairments that include degenerative joint disease, epileptic seizures and depression.

Plaintiff was last insured for DIB purposes on June 30, 2006.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary

of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir.

1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial

gainful activity (SGA).  A claimant engaged in such activity is not disabled.

 If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds

to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe

impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant

has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step

Three.  20 C.F.R. § 404.1520(c).

<u>Step Three</u>.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

<u>Step Four</u>.  The Commissioner determines whether the claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

<u>Step Five</u>.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  <u>Tackett</u>, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  <u>Id.</u>

**Medical Record**

On October 17, 2001, Plaintiff presented to the emergency department at Legacy Emanuel Hospital post seizure and then experienced another seizure in the emergency department.  Plaintiff was admitted into the Intensive Care Unit for monitoring.  An MRI of Plaintiff's head, with and without contrast and with coronal cuts was performed and was "completely normal."  A CT scan of Plaintiff's head was also taken and was "essentially normal."  The emergency department report and the "History and Physical" report from Plaintiff's October 17, 2001 hospital admission note that Plaintiff and Plaintiff's wife reported that he had experienced his first seizure, which was unwitnessed, approximately six weeks earlier and had experienced a second seizure approximately three weeks before.  By Plaintiff's account, paramedics responded to the seizure of three weeks before and Plaintiff was taken to Legacy Good Samaritan Hospital and Medical Center emergency department.  A CT scan of Plaintiff's head was taken which was negative.  He was given IV Dilantin and was sent home that same night.  The October 17, 2001 "History and Physical" provided by Dr. Meg Thygesen states that Plaintiff's wife reported that Plaintiff had no insurance or primary care physician and had not been taking any epileptic medications since his release from Good Samaritan.  There are no documents from the Good Samaritan visit contained in the record.

On October 19, 2001, two days after admission to Legacy Emanuel Hospital, Plaintiff received an in-hospital consult from Dr. Christopher Ginocchio, M.D.  Dr. Ginocchio reported that Plaintiff had been "loaded with Dilantin" in the emergency department, had been "very slow to get back to normal" but 24 hours later was "essentially back to normal" although "somewhat confused."  Dr. Ginocchio's impression was that Plaintiff had "primary generalized epilepsy."  Dr. Ginocchio prescribed a daily dose of Dilantin, instructed that Plaintiff not drive for six

months, and ordered that he get an electroencephalogram (EEG) as an outpatient and schedule a follow-up visit in a month's time.

Plaintiff contacted Dr. Ginocchio's office after experiencing a series of seizures on the night of February 6, 2002. Dr. Ginocchio scheduled an EEG and restarted Plaintiff's Dilantin. Plaintiff received an EEG on February 18, 2002, with normal results. On March 11, 2002, Dr. Ginocchio diagnosed Plaintiff with generalized tonoclonic seizures. Dr. Ginocchio noted that Plaintiff had ceased taking his Dilantin when the pills ran out about a month after his October hospitalization.

On May 31, 2002, Plaintiff again presented to the emergency department at Legacy Emanuel after suffering a seizure and hitting his head on the floor. At the time of admission, Plaintiff's Dilantin level was 2. A head CT scan was negative. Plaintiff was directed to follow up at the Adult Medicine Clinic on June 7, 2002 and to establish care with Dr. Susan Yoo on June 18, 2002. Plaintiff's Dilantin dose was "therapeutic at discharge" and he was prescribed Dilantin "300 mg p.o. q. day."

In his record of an office visit on July 10, 2002, Dr. Ginocchio noted that Plaintiff had been "a little sloppy about his medication ingestion and had a breakthrough seizure . . . on May 31, 2002." After that event Plaintiff was more regular about taking his medication and reported that he had not had any more seizures although he felt he had experienced a "pre-seizure."

On October 11, 2002, Dr. Ginocchio noted that Plaintiff had not had any more seizures but reported difficulty sleeping and resulting irritability and mood swings. Plaintiff also reported worsening low-grade tremors in his head and arms and Dr. Ginocchio observed a mild tremulousness of Plaintiff's head and hands. Plaintiff also reported that although he had not had any actual generalized tonoclonic seizures, he sometimes was waking himself up at night

because he had the sensation that he might be having a seizure.    Dr. Ginocchio noted that

Plaintiff was "clearly frustrated by his condition," was "at risk for severe depression" and in need

of counseling.  Although Plaintiff walked out of the office before the visit concluded, Dr.

Ginocchio gave Plaintiff's wife a refill prescription for Valium and a prescription for propranolol

and noted that numbers for Multnomah Behavioral Health would be given.

On December 18, 2002, Plaintiff was seen again in the emergency department of Legacy

Emanuel post-seizure.  He was diagnosed with subtherapeutic levels of Dilantin, directed to

increase his dosage to 300 mg two times a day and make an appointment with Dr. Ginocchio in

five to seven days.  Plaintiff was discharged the same day.

In his record of an office visit on March 28, 2003, Dr. Ginocchio noted that Plaintiff did

not increase his dosage of Dilantin to 300 mg b.i.d as advised after his December 2002 seizure

and emergency department visit because of limited funds and lack of insurance.  Dr. Ginocchio

assessed Plaintiff as experiencing "partial complex seizures spreading to generalized tonic-clonic

seizures."  Plaintiff expressed a desire to regain employment as a "repoman."  Dr. Ginocchio

noted he was willing to reinstate Plaintiff's driver's license but thought it would be better if

Plaintiff did not perform jobs that required him to drive because "this potentially will be a

recurrent problem or theme over the years to come."  Plaintiff's Dilantin dose was increased to

300 mg b.i.d.

Plaintiff's medical record resumes in June of 2003 while Plaintiff was incarcerated, first

with the Multnomah County Department of Corrections and then the Oregon Department of

Corrections.   Between June of 2003 and August 1, 2003 Plaintiff's Dilantin levels were

monitored regularly and the prescribed dosage of Dilantin was adjusted by Corrections medical

staff.  Plaintiff experienced a seizure on August 1, 2003.  He was on a high bunk and fell.

Plaintiff's Dilantin dosage was increased.

In November of 2003, Multnomah County Correction Health records reflect that Plaintiff

sought treatment for right knee pain.  Dr. James Bane observed mild swelling, moderate effusion

and minimal tenderness at the medial joint space and ordered an x-ray and orthopedic consult.

X-rays showed mild degenerative changes and the orthopedic diagnosis was for early

osteoarthritis and a likely tear of the meniscus.

Plaintiff reported an unwitnessed seizure to Correctional Facility medical staff in

December of 2003.

Plaintiff was transferred from Multnomah County Corrections to the Oregon Department

of Corrections at the end of January 2004.  His medical records reflect he was treated by ODC's

medical staff between January 27, 2004 and June of 2004.  Plaintiff's Dilantin levels continued

to be monitored.  No seizures were reported.

Plaintiff was examined by Dr. Tatsuro Ogisu on January 17, 2005.  Dr. Ogisu noted that

Plaintiff was "cooperative" and effort was "good."  He reported that Plaintiff was able to get on

and off the exam table without difficulty and that cervical and lumbar range of motion was full.

Plaintiff was able to perform a deep knee bend and rise without support but complained of right

knee pain.  Dr. Ogisu noted that at the knee there was no deformity or swelling but that

tenderness was "present at the anterior and medial joint line" and some "crepitus is noted."  Dr.

Ogisu's concluding impressions were that Plaintiff had a seizure disorder; that his neurologic

exam was normal and that there was right knee degenerative joint disease.  Dr. Ogisu completed

a functional assessment indicating that Plaintiff should be able to stand and walk for at least two

out of eight hours and lift and carry fifty pounds or perhaps more on an occasional basis and

FINDINGS AND RECOMMENDATION – 8

twenty-five pounds on a frequent basis.  He opined that the use of a walking stick was advisable especially over rough or steep terrain and that "[s]tandard seizure precautions apply."

On March 31, 2005, Plaintiff was seen by licensed clinical social worker Rise Kevalshar Collins at Lifeworks Northwest for a mental health evaluation for Adult Community Justice. Ms. Collins noted that Plaintiff had epilepsy and "strong psychosocial stressors" although he did not meet the DSM IV criteria for a diagnosis of a mental illness.

On May 10, 2005, Plaintiff was evaluated by J. Scott Pritchard, DO to assess Plaintiff's residual functional capacity (RFC).  Dr. Pritchard's notes indicate that he made in-person observations of Plaintiff in addition to reviewing his file.  Dr. Pritchard reported that Plaintiff was "cooperative" and "gives good effort" but opined that his "stated limitations (although consistent w/ his ADLs) appear exaggerated given objective findings."  Dr. Pritchard remarked on the Plaintiff's history of fluctuations in Dilantin levels and noted that Plaintiff "does well when therapeutic and there appears to be several indications of compliance issues, even in a structured setting."  Plaintiff demonstrated normal gait, full power except right knee extensors due to pain at 4/5, no focal neuro or dyscoordination.  Plaintiff reported that his seizure episodes still occurred exclusively at night and he is fatigued with headache upon awakening; that he walks .5 to 1.0 mile, lifts and carries 35-50 pounds, performs cooking and dishwashing but no outdoor chores or sports.

Dr. Pritchard did not fully accept Dr. Ogisu's opinion but found it "still reasonable" and completed a functional assessment indicating that plaintiff could lift and carry up to 25 pounds frequently and 50 pounds occasionally.  He opined that Plaintiff was capable of unlimited sitting and could stand and walk for a combined total of up to 6 hours in an 8-hour day and that "hazards and heights apply."

FINDINGS AND RECOMMENDATION – 9

Starting in February of 2006, Plaintiff attended physical therapy at Providence Downtown Rehabilitation Services for pre-operative and post-operative instructions and assessment related to surgery to reconstruct Plaintiff's right ACL.  Plaintiff completed four physical therapy sessions but missed his therapy appointment on March 29, 2006.  Physical therapy services were discontinued as of April 17, 2006.

Starting on June 1, 2006 Plaintiff attended physical therapy again at Providence Downtown Rehabilitation Services.  Referral to physical therapy was made by Laura Donaghu, MD based on a diagnosis that Plaintiff had "cervical strain/ pain s/p seizure 3/29."  The treatment record indicates that the referral stemmed from an incident on March 29, 2006 when Plaintiff experienced a seizure, fell on his back, possibly hitting his head on the floor and woke up in the ambulance with pain in the left posterior neck.  Plaintiff was treated at Providence Downtown from June 1, 2006 until June 30, 2006 when the original referral was complete and Plaintiff did not have insurance coverage for additional treatments.  At Plaintiff's final visit, the therapist noted that Plaintiff reported his left upper extremity symptoms had resolved.  It was noted that Plaintiff remained with constant pain of left levator scapula origin and that cervical AROM had overall improved with pain at end range of right side bending and left rotation.  The only other evidence in the record of Plaintiff's treatment post-dates the ALJ's March 24, 2008 decision.

**Hearing Testimony and Lay Witness Evidence**

1.  Plaintiff

Plaintiff testified as follows at the hearing before the ALJ:

Plaintiff last worked as an automotive repossessor in November of 2002 before being diagnosed with epilepsy and losing his driver's license.  He received clerical training in 1995 at Mt. Hood Community College and attended website design and acting classes in 2004, earning a

3.37 GPA.  He has also attended Walla Walla for a year, Portland State University for a term and Portland Community College for two terms.

Plaintiff has not looked for work since December 2002 but was performing volunteer work.  At the time of the hearing he had been volunteering thirty hours a week for three months in a clerical position, was volunteering ten hours a week as a coach for Grand Pop Warner football and had volunteered six hours a week in the spring and summer of 2007 as a Little League umpire.  Plaintiff was able to do clerical work but would "actually rather be driving as far as work;" could not do jobs other than driving and laborer jobs  because "the stress level at all those other jobs are extremely high" and the main problem that he thought kept him from working was stress.

Plaintiff was receiving a TANF grant and food stamps and was covered by the Oregon Health Plan.  Plaintiff's three children, ages 11, 10 and 8, live with him and he does household chores, cooks, does yard work such as cutting the grass and trimming, grocery shops, walks several miles daily and rides a bike when he doesn't want to walk.

Plaintiff testified at the hearing that he has never used illegal drugs except marijuana which he used in high school and, since 2002, does not drink alcohol.  He testified he had given inaccurate information and described a history of substance abuse to the social worker at Lifeworks because "he didn't like the lady."

Plaintiff's last seizure was March 29, 2006 for which he was hospitalized overnight.  He had three seizures between December 2002 and March 2006.  His seizures never happen except when he is sleeping.  The time it takes for him to recover from a seizure has "just been getting longer" with the last one taking him two to three weeks to recover from.  During that time he has a hard time remembering things, he is sore, there is a lot of confusion and "a lot of stuff is

FINDINGS AND RECOMMENDATION – 11

cloudy." Since 2002, Plaintiff has usually been getting three to four hours of sleep a night and

lays down one or two times a day, one to two times a week for somewhere around 15 minutes,

but does not sleep when he lies down.

He has a pinched nerve in his neck for which he was receiving physical therapy. This

limits the amount of time he can sit in a seat and requires him to adjust his position. Finger

movements aggravate the problem so that he has to stop for at least five to ten minutes or "just

work through the pain."

Plaintiff has been on Tegretol and medical marijuana since 2006. The medical marijuana

was prescribed for his epilepsy and inability to get proper or adequate sleep. The side effects of

the Tegretol are drowsiness and the need to avoid prolonged exposure to the sun. He had knee

surgery in 2006 and 9was able to stand an hour total in an eight hour day because of his knee.

He had not been to see the surgeon since his surgery because of his volunteer work schedule

which he was required to maintain to keep his TANF grant. Plaintiff could sit for an eight hour

day and could walk eight hours out of an eight hour day.

2. Lay Witness Evidence

The ALJ did not have time to take testimony from Plaintiff's mother or wife but, instead,

accepted submission of their written statements. Judy Wilson, Plaintiff's mother, wrote in a

letter as follows: Ms. Wilson personally took Plaintiff to the hospital while he was having a

seizure, within two or three months he had another seizure that happened during his sleep and

caused him to bite his tongue and vomit. He was again taken to the hospital and was unable to

recognize family members or friends. The next seizure again occurred during his sleep and again

caused him to bite his tongue and vomit. At the hospital he was strapped down and sedated

because of his actions when he has the seizures. Plaintiff had another seizure while standing up

and he fell and hit is head on the cement floor.  It took several days before he was functioning

again.  He has received a pinched nerve in his neck that is debilitating to the point that all he can

do is sleep to try and get rid of the pain.  During his most recent seizure he passed out at the top

of the stairs.  He was again taken to the hospital and given medication.

Jessica Watterson, Plaintiff's wife, in a submitted Third Party Function Report and a

Third Party Questionnaire from January 2005 wrote as follows: Mrs. Watterson has known

Plaintiff ten years.  They do not spend time together.[1]  Plaintiff's activities are very limited and

he stays close to home except for going to meetings and school.  Plaintiff helps care for his

children.  He needs to be reminded to take his pills.  He can go out alone but Mrs. Watterson is

scared because "he can have a seizure at any time."  After a seizure, Plaintiff has a hard time

with memory and concentration and with walking, talking, understanding, following instructions

and getting along with others.  Mrs. Watterson writes that Plaintiff is scared to go to sleep or

keep the children by himself.  She feels he cannot be left alone and that he has had seizures

awake and asleep.

### 3.  Vocational Expert's Testimony

The VE testified that she would be inclined to include the volunteer work that Plaintiff

described in an employment history because it was "being performed in a very corklike(sic)

pattern . . ."  The ALJ posed three vocational hypotheticals describing an individual with

Plaintiff's age, education and past relevant work experience.  The first hypothetical described

someone who could lift 50 pounds occasionally and 25 pounds frequently, stand and walk about

six of eight hours and sit about six of eight hours, should avoid climbing ladders, ropes, and

scaffolds and all hazards.  The VE testified that such an individual could not perform any

---

[1] The record indicates that at the time there was a restraining order between Plaintiff and his wife after the events
that led to his incarceration and that Plaintiff was living with other family.

laboring jobs but could work as an administrative clerk, or a shipping clerk or shipping

supervisor if the work environment was not in an industrial environment with hazards.

The second hypothetical described the same lifting limitations but changed the limitations

of standing and walking to two hours of an eight hour day, sitting without limitation, should use

a walking stick on rough terrain or steep ground and should avoid hazards.  The VE testified that

she believed the administrative clerk position was still consistent with the hypothetical.  She also

testified that the hypothetical was consistent with several clerical jobs and named general office

clerk and information clerk.

The ALJ then added to the second hypothetical that the job should involve a fairly low

level of pressure in terms of deadlines.  The VE testified that she thought that the individual

would be able to do the jobs she identified as she did not perceive them to be high stress

occupations.

Plaintiff's counsel then added another limitation to this third hypothetical by describing

an individual who will have unpredictable events of seizures which cause confusion for extended

periods of time, as much as a week or two.  The VE testified that the crucial factors to look at are

"frequency, duration and severity" and that if the rate of frequency of the seizures and the

residual effects create an inability to function for a sufficient duration of time "it would be

challenging, if not difficult, impossible to maintain employment."   If the individual couldn't

manage with sick time and vacation time or attend to work tasks despite their state of confusion

then the individual would not maintain employment.

## ALJ's Decision

At the first step of the decision that is at issue in this action, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since December 1, 2002.  She found that although

Plaintiff had performed part-time and short term work, his work had not risen to the level of

substantial gainful activity.

At the second step of her disability analysis, the ALJ found that Plaintiff's seizures and

degenerative joint disease of the right knee were severe impairments.

At the third step, the ALJ found that, alone or in combination, these impairments did not

meet or medically equal an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ next assessed Plaintiff's residual functional capacity.  She found that Plaintiff

retained the ability

> to lift 50 pounds occasionally and 25 pounds frequently.  He can stand and walk
> at least 2 hours out of an 8-hour day and sit without limitation.  He should use a
> walking stick when on rough or steep ground.  He should avoid hazards.

In formulating this assessment, the ALJ found that the Plaintiff's medically determinable

impairments could reasonably be expected to produce some of the alleged symptoms but that

Plaintiff's statements concerning the "intensity, persistence and limiting effects" of his

symptoms were not wholly credible.  The ALJ also found the allegations of Mrs. Watterson and

Ms. Wilson to be not entirely credible and the opinion of Lifeworks social worker, Rise

Kevalshar Collins, to be unpersuasive.

At the fourth step of her analysis, the ALJ found that Plaintiff could not perform any of

his past relevant work.

At the fifth step, the ALJ accepted the VE's testimony that an individual with Plaintiff's

age, education, work experience and residual functional capacity would be able to perform the

requirements of occupations such as general office clerk and information clerk.  The ALJ found

that the Plaintiff "has been capable of making a successful adjustment to other work that exists in

FINDINGS AND RECOMMENDATION – 15

significant numbers in the national economy." Based upon this finding, she concluded that Plaintiff was not disabled within the meaning of the Act.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## **Discussion**

Plaintiff contends that the ALJ improperly assessed his credibility; improperly rejected lay evidence; failed to make complete findings at Step Two regarding his mental impairment of depression; erred at Step Three by failing to cite any evidence for her findings regarding

FINDINGS AND RECOMMENDATION – 16

Plaintiff's epilepsy meeting or equaling a listing; erred in her assessment of his RFC; and erred in finding him able to perform semi-skilled jobs at Step Five without making findings as to transferable skills.

1.  Plaintiff's Credibility

A. Standard of Review

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment that can reasonably be expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ rejecting the claimant's testimony concerning the severity of his or her symptoms must provide "specific, clear and convincing reasons for doing so."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."  An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies or contradictions between the claimant's complaints and his activities of daily living.  Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).

B. Analysis

In his opening brief, Plaintiff asserts that the ALJ failed to properly apply the "Cotton Test" discussed in Smolen v. Chater, 80 F. 3d 1273 (9th Cir. 1996). However, because Plaintiff provides no argument in support of this assertion or even identifies the alleged flaws in the ALJ's application, this argument is deemed waived and I decline to search the record for error. United States v. Kama, 394 F.3d 1236, 1238 (9th Cir. 2005).

Plaintiff here produced evidence of underlying impairments that could reasonably be expected to produce some degree of the symptoms alleged, and there was no affirmative evidence of malingering. The ALJ was therefore required to provide specific, clear and convincing reasons for discounting Plaintiff's testimony concerning the severity of his symptoms and limitations.

In support of her credibility determination, the ALJ asserted that Plaintiff's testimony about the effect of his seizures was not supported by the medical record, that his testimony about his limitations was contradicted by his active lifestyle and that the absence of a record of continued treatment for right knee pain and a pinched nerve in the neck undermined Plaintiff's credibility as to the difficulties caused by these conditions.

The ALJ correctly noted inconsistencies between Plaintiff's testimony and a medical record that reflects that Plaintiff's seizures occur only at night and are well–controlled when he takes his medication. The ALJ noted that Plaintiff testified he had a seizure in March 2006 but that there was no evidence of seizures after December 2003 in the treatment record. However, there are, in fact, medical records covering Plaintiff's physical therapy for his pinched neck that do reference a March 29, 2006 seizure. The medical record does reflect continuing compliance and dosage issues with Plaintiff's medication. This nonetheless resulted in only a sporadic and

decreasing occurrence of seizures, with no seizure having occurred, by any account, since March of 2006.

The ALJ cited evidence of Plaintiff's daily activities including a 30 hour per week volunteer clerical job, a 10 hour per week volunteer football coaching position, yard and household chores, attendance at school and caring for three young children, all of which she found to be inconsistent with Plaintiff's testimony regarding the limiting effects of his symptoms.

The ALJ also noted that the treatment history for Plaintiff's knee and pinched nerve was inconsistent with Plaintiff's allegations of the difficulties caused by these conditions. Specifically, there was no treatment record for the pinched nerve after a six week course of physical therapy in June of 2006 and no record of treatment for right knee pain between diagnosis in November of 2003 and surgery and physical therapy in 2006.

The ALJ articulated clear and convincing reasons for finding Plaintiff's testimony less than wholly credible.  It may be that the ALJ mistakenly missed the evidence in the record of Plaintiff's March 2006 seizure and inappropriately attributed lack of continued treatment for Plaintiff's knee and neck to the fact that they were not significant medical issues as opposed to Plaintiff's financial and insurance coverage situation, which was noted many times in the record. However, even accepting that the ALJ erred in these respects, there is substantial evidence to support the ALJ's credibility determination and any error noted above, was harmless.  See Stout v. Comm'r, Social Sec. Admin., 454 F. 3d 1050, 1055 (9th Cir. 2006) (recognizing harmless error applies in the social security context); and Batson v. Comm'r, Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (holding harmless ALJ's partial reliance on assumption unsupported by the record where ALJ gave numerous other record-supported reasons for credibility finding).

FINDINGS AND RECOMMENDATION – 19

2.  Credibility of Lay Evidence

Plaintiff contends that the ALJ improperly rejected lay witness statements and letters from Plaintiff's mother and wife.  An ALJ must provide a "germane" reason for rejecting the statements of a lay witness.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  Inconsistency with medical evidence is one such reason. Id.

In her decision, the ALJ stated that the allegations of Plaintiff's wife, Mrs. Watterson, "are not entirely credible in light of the treatment record."  In 2005, Mrs. Watterson reported that Plaintiff could not be left alone due to the possibility of seizures and his mind did not work like it did before the seizures.  In contrast, the ALJ found that the record reflected that Plaintiff's seizures were controlled by medication and occurred only at night and that Plaintiff was attending college and getting good grades at the time.  The ALJ's reasoning is germane to this witness.

The ALJ also discounted the opinion of Plaintiff's mother, "because she was vague and not very objective."  In a 2007 letter, Ms. Wilson described details of Plaintiff's seizures but did not include any dates or time references.  She also wrote that Plaintiff's pinched nerve was debilitating to the point that he could not function.  The ALJ found that the record reflected that Plaintiff's seizures were controlled by medication, that Plaintiff had an active lifestyle and that there were was no evidence of ongoing symptoms or treatment for his neck pain beyond a brief period of physical therapy.  Her reasoning is germane to this witness and I find no error.

3.  Step Two Findings

Plaintiff asserts that the ALJ's analysis at Step Two completely omits Plaintiff's mental impairment of depression, of which there is evidence in the medical record.  Plaintiff contends

that even if the impairment is not severe or not medically determinable, there must be a finding, utilizing the "'special technique' set forth in 20 C.F.R. s. 404.1520a."

Plaintiff's argument fails to cite references to the medical record. The licensed clinical social worker from Lifeworks who evaluated Plaintiff concluded he did not meet the DSM IV criteria for diagnosis of a mental illness. I have found no medical evidence consisting of the "signs, symptoms, and laboratory findings" that are required to establish a mental impairment under 20 C.F.R. §§ 404.1508; 416.908. In light of the record, it was not error to exclude findings regarding Plaintiff's alleged mental impairment of depression.

4. Sufficiency of Findings at Step Three

At Step Three, the ALJ found that "[n]o treating or examining doctor has indicated that the medical evidence supports the conclusion that claimant's conditions meet or equal a listing." Plaintiff contends that the ALJ's analysis at Step Three is "non-existent" and relied on "no evidence" for her finding that Plaintiff's epilepsy did not meet or equal a listing. Plaintiff argues that no evidence does not constitute evidence and that the ALJ should have performed a detailed and "thoughtful" analysis of Listing 11.02.

Plaintiff misinterprets the ALJ's decision. The ALJ's conclusion was based on a determination that no treating or examining physician found the medical evidence supportive of a conclusion that Plaintiff's epilepsy met or equaled a listing. This is not the same thing as "no evidence." In fact, the RFC Assessment completed by Dr. Pritchard states that "QHS seizure activity does not M/E the frequency or severity of the listings." The ALJ found the opinion of Dr. Pritchard to be generally consistent with the treatment record and gave it significant weight. The ALJ also gave significant weight to the opinion of examining physician Tatsuro Ogisu, M.D. because she found him to be "objective and thorough." Dr. Ogisu opined that Plaintiff's

neurologic exam was normal and indicated that "[s]tandard seizure precautions apply." Both Dr.

Pritchard and Dr. Ogisu's reports detail a familiarity with the "type, frequency, duration, and

sequelae of [Plaintiff's] seizures" Listing 11.00. The ALJ's conclusion that Plaintiff's condition

did not meet or equal a listing was supported by substantial evidence in the record and was not

based upon legal error.

5. Residual Functional Capacity Assessment

Plaintiff contends that one of the jobs identified as suitable for Plaintiff is outside the

sedentary RFC assessed by the ALJ. Plaintiff argues that the ALJ's finding that he could stand

and walk "at least" two hours out of eight renders this limitation impermissibly vague and makes

it difficult to determine whether Plaintiff's exertional profile should be considered sedentary or

light. Because the job of general office clerk has a "Light" exertional level rating, without a

clear ability to stand and walk for six out of eight hours, Plaintiff would be unable to meet the

requirements of that job. (DOT 209.562-010).

The ALJ's determination that Plaintiff could perform the jobs of general office clerk and

information clerk was based upon the vocational expert's testimony. That testimony responded

to the ALJ's posed hypotheticals and reasonably accounted for Plaintiff's age, education, work

experience, and residual function capacity (RFC). The vocational expert testified that Plaintiff

would be able to perform "the requirements of representative occupations such as general office

clerk and information clerk." The ALJ found the vocational expert's testimony to be consistent

with the information contained in the Dictionary of Occupational Titles and was entitled to rely

on that testimony in determining whether there were suitable jobs in the national economy for

Plaintiff to perform. See, e.g. Tackett, 180 F.3d at 1101 (burden of showing that there is other

work in "significant numbers" in the national economy that claimant can perform can be met by

the testimony of a vocational expert).

6.   Transferability of Skills

Plaintiff asserts that the ALJ erred in finding transferability of skills not material to

finding that Plaintiff was capable of performing semi-skilled jobs at Step Five of the sequential

analysis.  Plaintiff relies on Bray v. Comm'r, Soc. Sec. Admin., 554 F.3d 1219 (9th Cir. 2009) in

arguing that transferability is material in this case and the ALJ was required to make express

findings as to the existence of any transferable skills.

In Bray, the court held that the ALJ erred by assuming that the claimant possessed

transferable skills without making specific findings in support of that assumption.  This case is

distinguishable from Bray.

Here, the ALJ determined

Transferability of job skills is not material to the determination of disability
because using the Medical-Vocational Rules as a framework supports a finding
that the claimant is "not disabled," whether or not the claimant has transferable
job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

Unlike in Bray, Plaintiff is not of advanced age or in a borderline age category.  He is a

"younger individual."  Under 20 C.F.R. Part 404, Subpart P, Appendix 2, a "younger individual

age 18-44" capable of sedentary or light work with Plaintiff's education and previous work

experience is "not disabled" regardless of whether that person is unskilled, skilled or

semiskilled and regardless of whether those skills are transferable or not transferable.  See §§

201.23 - .29 and 202.16 - .22.  The ALJ recognized that because the Plaintiff had additional

limitations, the Medical-Vocational Rules did not direct a conclusion of disabled or not disabled

but instead provided a framework to support a finding.  Within that framework, under the facts

of this case, transferability of skills was not material.  Even assuming, without deciding, that

FINDINGS AND RECOMMENDATION – 23

Plaintiff is correct that the ALJ erred by not specifically identifying Plaintiff's skills and analyzing how those skills may be applied to the jobs identified at Step Five, transferability of skills was not material so the failure to identify those skills was harmless error.  See Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990). (error held harmless where finding was "immaterial" to the ALJ's nondisability determination; a decision of the ALJ will not be reversed for errors that are harmless.)

## Conclusion

A judgment should be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due December 5, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 16th day November, 2011.


 /s/ John Jelderks                          .
John Jelderks
U.S. Magistrate Judge


FINDINGS AND RECOMMENDATION – 24